**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **VALARIE BETH KINGERY** on behalf of **THE ESTATE OF RANDY FREEMAN KINGERY, DECEASED** | § § § § | Case No.:     1:14-cv-6814 |
| and | § § | **COMPLAINT** |
| **VALARIE BETH KINGERY** | § § | Jury Trial Demanded |
| Plaintiffs, | § § § | |
| v. | § § | |
| **PHARMACIA & UPJOHN COMPANY INC.** | § § § | |
| and | § § | |
| **PFIZER INC.,** | § § § | |
| Defendants. | § | |

Plaintiffs The Estate of Randy Freeman Kingery, Deceased, by its administrator, Valarie Beth Kingery and Valarie Beth Kingery, an individual, complaining against Defendants Pharmacia & Upjohn Company Inc. and Pfizer Inc., aver and state:

## I.     PROCEDURAL AND FACTUAL BACKGROUND

### A.     INTRODUCTION

1.     This case involves the prescription drug Depo-Testosterone, which Defendants Pharmacia & Upjohn Company Inc. and Pfizer Inc. (hereinafter jointly "Defendants" or "Pfizer") manufacture, sell, distribute, and promote as a testosterone replacement therapy.

2.     Defendants misrepresented that Depo-Testosterone is a safe and effective treatment for hypogonadism and a condition they referred to as "low testosterone," when, in fact,

the drug causes serious medical problems, including life threatening cardiac events, strokes, and thromboembolic events.

3.      Depo-Testosterone is an exogenous form of the androgen testosterone. It regulates the expression of platelet $TXA_2$ receptors in humans, which significantly increases platelet aggregation. It causes an increase in hematocrit and estradiol in adult males, resulting in thickened blood, the development of blood clots, and heart damage. These effects, if not monitored and controlled properly, can lead to life threatening cardiac events, strokes and thromboembolic events, including but not limited to deep vein thrombosis, pulmonary embolism, transient ischemic attacks, ischemic stroke, and numerous types of cardiovascular injuries.

4.      Depo-Testosterone is the androgenic hormone testosterone delivered by intramuscular injection. It is available in two strengths: 100 mg/mL and 200 mg/mL.

5.      Defendants failed to adequately warn physicians about the risks associated with Depo-Testosterone and the monitoring required to ensure their patients' safety.

6.      Defendants engaged in marketing and advertising campaigns for Depo-Testosterone including an aggressive unbranded "disease awareness" campaign to alert men that they might be suffering from "low testosterone."

7.      Defendants further benefitted from their competitors' marketing and advertising efforts to create a disease known as "Low T" by asking doctors to prescribe Depo-Testosterone when their patients, convinced they had "low testosterone" asked for a testosterone replacement therapy (TRT) prescription.

8.      The FDA has not approved any testosterone replacement therapy drug as a treatment for "low testosterone" or "Low-T." Additionally, low testosterone is not a disease

recognized by the medical community. Instead, it is a normal result of the aging process experienced by the majority of males.

9.      Because of this "disease mongering," as termed by Dr. Adriene Fugh-Berman of Georgetown University Medical Center, diagnoses of "Low T" have increased exponentially.

10.     Consumers of Depo-Testosterone and their physicians relied on Defendants' false representations and were misled as to the drug's safety and efficacy, and as a result have suffered injuries including life-threatening cardiac events, strokes, and thromboembolic events.

**B.     PARTIES**

11.     Plaintiffs The Estate of Randy Freeman Kingery, Deceased is an estate created under the laws of the State of Kentucky that designates Valerie Beth Kingery as its administrator and sole heir.

12.     Plaintiff Valerie Beth Kingery is an individual, is a resident of Hanson, Kentucky and is a citizen of Kentucky.

13.     Defendant Pharmacia & Upjohn Company Inc. is a corporation existing under the laws of the state of Delaware with its principal place of business in New York, New York.

14.     In FDA filings, Defendant Pharmacia & Upjohn Company Inc. calls itself a division of Pfizer Inc.

15.     Defendant Pfizer Inc. is a corporation existing under the laws of the state of Delaware with its principal place of business in New York, New York.

16.     Defendants engaged in the business of designing, licensing, manufacturing, testing, advertising, warranting, distributing, supplying, selling, and introducing into the stream of commerce products known as Depo-Testosterone. Defendants sold and marketed Depo-Testosterone in Illinois, in Kentucky, and throughout the United States.

17.    The officers and directors of Defendants participated in, authorized, and directed the production and promotion of Depo-Testosterone when they knew, or with the exercise of reasonable care should have known, of the hazards and dangerous propensities of the product and thereby actively participated in the tortious conduct which resulted in the injuries suffered by Plaintiff herein.

### C.    JURISDICTION AND VENUE

18.    Subject matter of this action arises under 28 U.S.C. § 1332. The parties are citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

19.    This Court has personal jurisdiction of the Defendants because the Defendants have a place of business in Illinois.

20.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because, inter alia, a substantial part of the events or omissions giving rise to the Plaintiff's claims occurred in, and because the Defendants transact business in, this district.

### D.    FACTUAL BACKGROUND

#### 1.    General Allegations

21.    This action is for damages brought on behalf of Plaintiff who was prescribed and supplied with, received, and who has taken and applied the prescription drug Depo-Testosterone, as tested, studied, researched, evaluated, endorsed, designed, formulated, compounded, manufactured, produced, processed, assembled, inspected, distributed, marketed, labeled, promoted, packaged, advertised for sale, prescribed, sold, or otherwise placed in the stream of interstate commerce by Defendants. This action seeks, among other relief, general and special damages and equitable relief in order to enable Plaintiff to treat and monitor the dangerous, severe, and life-threatening side effects caused by this drug.

22.     Defendants' wrongful acts, omissions, and fraudulent misrepresentations caused Plaintiff's injuries and damages.

23.     At all times herein mentioned, Defendants were engaged in the business of, or were successors in interest to, entities engaged in the business of research, licensing, designing, formulating, compounding, testing, manufacturing, producing, processing, assembling, inspecting, distributing, marketing, labeling, promoting, packaging, and/or advertising for sale or selling the prescription drug Depo-Testosterone for the use and application by men, including, but not limited to, Plaintiff.

24.     At all times herein mentioned, Defendants were authorized to do business within the states of Kentucky and Illinois.

25.     At all times herein mentioned, the officers and directors of Defendants participated in, authorized, and directed the production and promotion of Depo-Testosterone when they knew, or with the exercise of reasonable care should have known, of the hazards and dangerous propensities of said product and thereby actively participated in the tortious conduct which resulted in the injuries suffered by Plaintiff herein.

26.     Plaintiff files this lawsuit within the applicable limitations period of first suspecting that said drug caused the appreciable harm sustained by Plaintiff. Plaintiff could not, by the exercise of reasonable diligence, have discovered the wrongful cause of his injuries as their cause was unknown to Plaintiff. Plaintiff did not suspect, nor did Plaintiff have reason to suspect, that Plaintiff had been injured, the cause of the injuries, or the tortious nature of the conduct causing the injuries, until less than the applicable limitations period prior to the filing of this action. Additionally, Plaintiff was prevented from discovering this information sooner because Defendants misrepresented and continue to misrepresent to the public and to the medical

profession that the drug Depo-Testosterone is safe and free from serious side effects, and Defendants have fraudulently concealed facts and information that could have led Plaintiff to discover a potential cause of action.

### 2. Regulatory History and Approved Uses

27. Testosterone is a primary androgenic hormone responsible for normal growth, development of the male sex organs, and maintenance of secondary sex characteristics.

28. The hormone plays a role in sperm production, fat distribution, maintenance of muscle strength and mass, and sex drive.

29. In men, testosterone levels normally begin a gradual decline after the age of thirty.

30. The average testosterone levels for most men range from 300 to 1,000 ng/dl of blood. However, testosterone levels can fluctuate greatly depending on many factors, including sleep, time of day, and medication. Resultantly, many men who may have testosterone levels below 300 ng/dl on one day will have normal testosterone levels the next. Additionally, testosterone levels gradually decline as men age. This decline in serum testosterone levels is a normal process that does not represent a medical condition or disease.

31. The Food and Drug Administration approved Depo-Testosterone for the treatment of adult males who have low or no testosterone (a condition called Hypogonadism) in conjunction with an associated medical condition. Examples of these conditions include failure of the testicles to produce testosterone for reasons such as genetic problems or chemotherapy. After FDA approval, Defendants advertised and marketed Depo-Testosterone as a safe and effective testosterone replacement therapy for "males with low testosterone."

32. Hypogonadism is a specific and recognized condition of the endocrine system, which in men may involve the severely diminished production or nonproduction of testosterone.

Primary hypogonadism occurs under circumstances of congenital or acquired pathologic insults to and conditions of the testes in men. Secondary hypogonadism occurs under circumstances of hypogonadotropism, including hypothalamic-pituitary diseases and disorders and other conditions that cause suppression of gonadotropin-releasing hormone (GnRH).

33.     When Defendants first sought and received FDA approval for Depo-Testosterone, hypogonadism was considered to be a relatively uncommon condition among American men.

34.     After the FDA approved Depo-Testosterone and as other testosterone products came on the market, TRT manufacturers engaged in media campaigns to convince men who were experiencing the typical effects of the aging process that they were suffering from low testosterone, which could be treated with testosterone supplements, including Depo-Testosterone. These marketing campaigns consisted of advertisements, promotional literature placed in healthcare providers' offices and distributed to potential DEPO-Testosterone users, and online media.

35.     A study published in the Journal of the American Medical Association ("JAMA") in August 2013 entitled "Trends in Androgen Prescribing in the United States, 2001–2011" indicated that many men who get testosterone prescriptions have no evidence of hypogonadism. For example, one third of men prescribed testosterone had a diagnosis of fatigue, and one quarter of men did not even have their testosterone levels tested before they received a testosterone prescription. A Canadian study showed that only about 6.3% of men who were prescribed testosterone actually met the diagnostic criteria for hypogonadism.

36.     At all times material hereto, and since the time Depo-Testosterone first received FDA approval, Defendants knew and understood the FDA-approved indications for clinical use of the TRT product.

### 3. Direct to Consumer Marketing and Promotion to Physicians for Unbranded/Off-Label Use.

37. Defendants expanded the indications for use by promoting and detailing "low testosterone" as an acquired form of hypogonadism, and advantaged intentional ambiguity in the product labeling as a basis for "label expansion" and "off-label" marketing, detailing, and promotion to physicians.

38. Defendants coordinated an advertising campaign targeted toward men who did not have hypogonadism, nor had low or no testosterone in conjunction with an associated medical condition. Defendants designed their direct-to-consumer and physician marketing to convince men they suffer from a nonexistent and unrecognized medical condition called "low testosterone." Defendants purported to educate male consumers about low testosterone and their solution (Depo-Testosterone) to the condition.

39. Defendants benefited from competitors' efforts that suggest various symptoms often associated with other conditions may be caused by low testosterone and encourage men to discuss testosterone replacement therapy with their doctors if they experienced any of the "symptoms" of low testosterone. These "symptoms" include listlessness, increased body fat, and moodiness—all general symptoms that are often a result of aging, weight gain, or lifestyle, rather than low testosterone.

40.     To take advantage of the their own and other TRT makers' disease-awareness campaigns, Defendants' marketing to doctors actively blurs the line between Depo-Testosterone's approved indications and "low testosterone." For example, in spite of the approved indications for Depo-Testosterone, Defendants assert:



41.     Defendants seek to convince primary care physicians that hypogonadism is synonymous with "low testosterone."

42.     By saying their product has been used for decades, Defendants also imply their product is safe for treatment of men with "low testosterone."

43.     Consumers and their physicians relied on Defendants' promises of safety and ease. Men who had never been prescribed testosterone flocked to their doctors and pharmacies.

44.     Defendants manufactured, sold, and promoted the drug to treat a non-existent medical condition they call "low testosterone," and capitalized on the impression that symptoms of the normal aging process can be cured by Depo-Testosterone injections. In essence,

Defendants marketed and sold testosterone as a lifestyle drug meant to make men feel younger and increase libido.

45.     As observed by Lisa M. Schwartz, M.D., M.S. and Steven Woloshin, M.D., M.S. in their article "Low T as a Template: How to Sell Disease" published in JAMA Internal Medicine 173(15):1460-1462 (August 12/26, 2013) concerning the "Low T" campaigns by the pharmaceutical industry:

> Whether the campaign is motivated by a sincere desire to help men or simply by greed, we should recognize it for what it is: a mass, uncontrolled experiment that invites men to expose themselves to the harms of a treatment unlikely to fix problems that may be wholly unrelated to testosterone levels.

> We agree with Braun that there is a strong analogy between the marketing of testosterone therapy for men and estrogen therapy for menopausal women. Ignoring the lessons of estrogen therapy is scandalous. Before anyone makes millions of men aware of Low T, they should be required to do a large-scale randomized trial to demonstrate that testosterone therapy for healthy aging men does more good than harm.

46.     TRT sales have more than doubled since 2006, and are expected to triple to $5 billion by 2017, according to forecasts by Global Industry Analysts. Shannon Pettypiece, *Are Testosterone Drugs the Next Viagra?*, May 10, 2012, Bloomberg BusinessWeek, *available at:* http://www.businessweek.com/articles/2012-05-10/are-testosterone-drugs-the-next-viagra.

47.     TRT manufacturers sought to create the image and belief by consumers and physicians that low testosterone was an actual disease or medical condition that affected a large number of men in the United States, and that using TRT is safe and effective as a treatment for "low testosterone," even though Defendants knew these to be false, and even though Defendants had no reasonable grounds to believe them to be true.

48.     At all times material hereto, Defendants' marketing strategy included the use of sales or drug detailing representatives ("reps") and marketing personnel who performed on-line

and in-person TRT product detailing to physicians as well as promotional and detailing to healthcare providers.

49.     Defendants' drug detailing "reps" provided physicians and healthcare providers with information and literature concerning the indications for clinical use of the Depo-Testosterone product, as well as discount and/or rebate coupons to give to patients for the purchase of Depo-Testosterone.

50.     Defendant's drug "reps" detailed and marketed Depo-Testosterone to physicians as a product approved and indicated for the treatment of age-related declines in testosterone levels and age-related symptoms.

51.     Defendants denominated and characterized age-related declines in testosterone levels and age-related symptoms in men as "low testosterone" and used the "low testosterone" moniker to denote and connote that the presence of age-related declines in testosterone levels and age-related symptoms in men were a form of acquired hypogonadism.

52.     Defendants knew and understood the meaning of the terms "off-label" and "label expansion."

53.     Defendants knew and understood the FDA regulations pertaining to "off-label" marketing and promotion of an FDA-approved pharmaceutical product.

54.     Defendants marketed, promoted, and detailed Depo-Testosterone for "off-label" use for the purpose of "label expansion," detailed and promoted the product to physicians, and advertised the product to consumers and patients, under the rubric that "low testosterone" is synonymous with hypogonadism and that Depo-Testosterone is approved and indicated for clinical use in treating "low testosterone."

55.     A manufacturer may not introduce a drug into interstate commerce with an intent that it be used for an "off-label" purpose.

56.     A manufacturer misbrands a drug if the labelling or any of the manufacturer's promotional and advertising materials describe an intended use for the drug that has not been approved by the FDA.

57.     Promotional materials are misleading if they suggest that a drug is useful in the treatment of a broader range of conditions, or in a broader population of patients, than has been demonstrated by substantial evidence or substantial clinical experience.

58.     Promotional materials are misleading if they represent or suggest that a drug is more effective than has been demonstrated by substantial evidence or substantial clinical experience.

59.     Promotional materials are misleading if they fail to reveal facts that are material in light of the representations made, or with respect to the consequences that may result from the use of the drug as recommended or suggested by the materials.

60.     The FDA has not approved Depo-Testosterone for the treatment of:

     a.   age-related declines in testosterone levels in men;

     b.   age-related symptoms;

     c.   mood disorders, including depression or grumpiness or inability to concentrate;

     d.   lack of sexual interest or decreased libido;

     e.   disorders of erectile function or erectile dysfunction;

     f.   loss of muscle mass; or,

     g.   bone strength or density abnormalities.

### 4. Adverse Events and Serious Health Risks Caused by TRT.

61.     There have been a number of studies associating testosterone use in men with an increased risk of serious injuries from blood clots and cardiovascular events.

62.     Testosterone replacement therapy involves the administration of exogenous testosterone into the male body in an attempt to raise the serum level of total testosterone. This is achieved through the application of a cream, gel, or patch directly to the skin for transdermal absorption into the body. It can also be delivered into the body by subcutaneous injection or placement of a time-released pellet containing the drug.

63.     The absorption of exogenous testosterone into the male body can cause an increase in serum levels of testosterone, and results in an increase in hematocrit[1] and serum estradiol levels.[2] It can also cause increased platelet aggregation and vasoconstriction.

64.     Hematocrit is the proportion of total blood volume that is comprised of red blood cells. Erythrocytosis is an increase in the number of circulating red blood cells especially resulting from a known stimulus (like Testosterone). When a person's hematocrit level is raised through erythrocytosis, the resulting condition is called polycythemia, which simply means an elevated red blood cell count. The range for normal hematocrit levels in adult males is 44–48%.

65.     The administration of exogenous testosterone causes a 7–10% increase in hematocrit levels in adult males through the process of erythrocytosis.[3] An increase of hematocrit that is 7–10% above normal range is a significant elevation and qualifies as polycythemia. This serious medical condition requires treatment to prevent injury.

---

[1] Fernandez-Balsells, M., et al., Adverse Effects of Testosterone Therapy in Adult Men: A Systematic Review and Meta-Analysis. J Clin Endocrinol Metab, June 2010, 95(6):2560–2575.

[2] Finkelstein, JS, et al., Gonadal Steroids and Body Composition, Strength, and Sexual Function in Men. N Engl J Med 2013;369:1011-22.

[3] Bachman, E., et al. Testosterone Induces Erythrocytosis via Increased Erythropoietin and Suppressed Hepcidin: Evidence for a New Erythropoietin/Hemoglobin Set Point. J Gerontol A Biol Sci Med Sci., 2013.

66.     Clinical trial data submitted to the FDA for the approval of AndroGel (a later competing product) showed the use of exogenous testosterone resulted in nine percent of subjects experiencing hematocrit levels greater than 56% at some point during the study. A hematocrit level of 56% is significantly elevated above the normal range and qualifies as polycythemia. This level puts the patient at serious risk for an adverse health consequence and requires immediate treatment and/or cessation of the testosterone therapy.

67.     Elevated hematocrit is an independent risk factor for stroke and it interacts synergistically with elevated blood pressure. In a published study[4] the cohort for men with a hematocrit level greater than or equal to 51% had a more than doubling of the risk of stroke (RR=2.5), and among males in the cohort who were also hypertensive there was a nine-fold increase in the risk of stroke for those with hematocrit greater than or equal to 51%.

68.     Elevated hematocrit is also an independent risk factor for adverse cardiovascular events. Using data from the Framingham Heart Study, researchers documented a strong, graded relationship between hematocrit level and the risk of developing heart failure. In 3,523 Framingham participants aged 50-65 who were free of a history of heart failure at baseline and were followed prospectively for up to 20 years, individuals with a hematocrit level greater than or equal to 50% had almost double the risk of new-onset heart failure during follow-up, compared with those with a low hematocrit, even after adjustment for conventional risk factors for heart failure.[5]

69.     In another study of 680 males conducted over 28 years in Finland, the data showed men with a hematocrit level greater than or equal to 50% were 2.4 times more likely to

---

[4] Wannamethee G1, Perry IJ, Shaper AG, Haematocrit, hypertension and risk of stroke. J Intern Med. 1994 Feb;235(2):163-8.

[5] Coglianese, E., et al., Usefulness of the Blood Hematocrit Level to Predict Development of Heart Failure in a Community. Am J Cardiol. Jan 15, 2012; 109(2): 241–245. Published online Oct 12, 2011

die from coronary heart disease than men with hematocrit levels of less than 50%. Even after adjusting for established coronary risk factors, the increased risk remained 1.8-fold for the higher hematocrit cohort.[6]

70.     In yet another large, prospective study[7] in Norway, the data show a hazard ratio of 1.25 per 5% rise in hematocrit. In a category-based analysis, a hematocrit level in the upper 20th percentile was found to be associated with a 1.5-fold increased risk of venous thrombosis, and a 2.4-fold increased risk of unprovoked venous thromboembolism compared to men whose hematocrit was in the lower 40th percentile.

71.     An increase in the level of hematocrit also causes an increase in the viscosity of the blood. A 10.99% increase of hematocrit produces an increase of one unit relative viscosity, which means approximately a 20% increase in blood viscosity for a healthy individual.[8] An increase in blood viscosity is a known risk factor for ischemic heart disease,[9] and it can cause hypertension as blood pressure increase will be 20% or vasodilation will be 4.66% in radius for the physiologic compensation of 20% increased viscosity. Hypertension is a known cause of atherosclerosis, heart failure, and stroke. Testosterone makes blood thick and viscous, which, in turn, can cause numerous health risks and injuries for patients.

72.     The major source of estradiol in men comes from the aromatization of testosterone (endogenous and/or exogenous) to estradiol. When men are given testosterone, either by application of an androgen gel or by injection, some of that testosterone is

---

[6] Kunnas, T, et al., Hematocrit and the risk of coronary heart disease mortality in the TAMRISK study, a 28-year follow-up. Prev. Med. Volume 49, Issue 1, July 2009, Pages 45–47.

[7] Braekkan SK, Mathiesen EB,et al., Hematocrit and risk of venous thromboembolism in a general population. The Tromso study. Haematologica. 2010 Feb; 95(2):270-5.

[8] Cinar, Y., et al., Effect of hematocrit on blood pressure via hyperviscosity. Am J Hypertens. 1999 Jul;12(7):739-43.

[9] Yarnell, JW, et al., Fibrinogen, viscosity, and white blood cell count are major risk factors for ischemic heart disease. The Caerphilly and Speedwell collaborative heart disease studies. Circulation. 1991 Mar;83(3):836-44.

converted by the body (aromatized) to estradiol.[10] The increase of estradiol is in direct relation to the amount of exogenous testosterone delivered; the higher the dose of testosterone, the higher the level of serum estradiol.[11]

73.     In data gathered from 2,197 men who participated in the Honolulu Aging Study from 1991-1993 and who were followed for thromboembolic and hemorrhagic events until 1998, there was a two-fold excess risk of stroke for men who had serum estradiol levels in the top quintile versus those men whose estradiol levels were lower.[12] This study revealed that estradiol blood levels greater than 34.1 pg/mL resulted in this more than doubling of stroke incidence. As a source of embolism, the authors noted that the prevalence of atrial fibrillation rose significantly from 1.0 to 4.4% from the bottom to the top estradiol quintiles. Atrial fibrillation is a known cause of thrombus formation.

74.     If men have an underlying, inherited trait that increases their  risk of blood clotting, particularly the Factor V Leiden mutation, the Prothrombin gene mutation, high Factor VIII, high homocysteine, or the lupus anticoagulant, the estradiol can interact with the underlying clotting trait to produce blood clots in the legs, the  lungs, the  eyes, the  brain, and the bones.[13]

75.     In a study published 2006, blood levels of estradiol were measured in 313 men whose average age was 58. Carotid artery intima-media thickness was measured at baseline and then three years later. After adjusting for other risk factors, men with higher levels of estradiol suffered a worsening thickening of their carotid artery wall. This led the researchers to conclude:

---

[10] Glueck, CJ, et al., Thrombotic events after starting exogenous testosterone in men with previously undiagnosed familial thrombophilia. Trans. Res. Oct. 2011.

[11] Finkelstein, JS, et al., Gonadal Steroids and Body Composition, Strength, and Sexual Function in Men. N Engl J Med 2013;369:1011-22.

[12] Abbott, RD, et al., Serum Estradiol and Risk of Stroke in Elderly Men. Neurology 2007, 68:563-568.

[13] Glueck, CJ, et al., Testosterone, thrombophilia, thrombosis. Blood Coagulation and Fibrinolysis 2014, 25:00–00.

"circulating estradiol is a predictor of progression of carotid artery intima-media thickness in middle-aged men."[14] These findings of a positive association between serum estradiol levels and intima-media thickening supports the notion that estrogens, besides possibly increasing the risk for thrombosis and thereby cardiovascular events, also have an important impact on atherogenesis in men.

76.     In a case control study of men in the Framingham cohort *supra*, serum estradiol levels were significantly increased in subjects with coronary heart disease.[15]

77.     Estradiol has a greater effect in the male heart through the regulation of gene expression that it does not in female hearts. This effect results in impaired contractile function of the heart in males with elevated levels of serum estradiol.[16] Impaired contractile function results in numerous cardiovascular injuries and disease.

78.     A study published in 2007 compared blood levels of testosterone and estradiol in men suffering acute myocardial infarction (heart attack) with those who had previously suffered a heart attack. Sex hormones were measured in patients presenting with acute heart attack, patients with old heart attack, and patients with normal coronary arteries. The results showed significantly higher levels of estradiol in both groups of heart attack patients compared with those without coronary disease.[17] Another study evaluated the sex hormones in men admitted to the hospital with acute heart attacks. Compared with control patients, estradiol levels in these

---

[14] Tivesten, A., et al., Circulating Estradiol is an Independent Predictor of Progression of Carotid Artery Intima-Media Thickness in Middle-Aged Men, J CLIN ENDOCRINOL METAB, November 2006, 91 (11): 4433-4437.

[15] Phillips GB, Castelli WP, Abbott RD, et al., Association of Hyperestrogenemia and Coronary Heart Disease in Men in the Framingham Cohort, Am J Med, 1983 74:863-869.

[16] Kararigas, G., et al., Transcriptome Characterization of Estrogen-Treated Human Myocardium Identifies Myosin Regulatory Light Chain Interacting Protein as a Sex-Specific Element Influencing Contractile Function, JACC Vol. 59, No. 4, January 24, 2012, 2012:410-7.

[17] Mohamad MJ, Mohammad MA, Karayyem M, Hairi A, Hader AA. Serum levels of sex hormones in men with acute myocardial infarction. Neuro Endocrinol Lett. 2007 Apr;28(2):182-6.

heart attack patients were **180%** higher, while bioavailable testosterone levels were **nearly three times less** than those of control patients.[18]

79.     High testosterone levels enhance acute myocardial inflammation, adversely affecting myocardial healing and early remodeling, as indicated by increased cardiac rupture, and possibly causing deterioration of cardiac function after MI, and, conversely, estrogen seems to have no significant protective effect in the acute phase after MI.[19]

80.     Thromboxane A2 (TXA2) is a vasoconstrictor and platelet pro-aggregatory agent that has been implicated in the pathogenesis of cardiovascular disease. Thromboxane A2 has been unequivocally implicated in a range of cardiovascular diseases, owing to its acute and chronic effects in promoting platelet aggregation, vasoconstriction and proliferation. A study published in 1995 demonstrated that testosterone treatment was associated with a significant increase in the maximum platelet aggregation response and this effect may contribute to the thrombogenicity of androgenic steroids like testosterone.[20]

81.     In 2010, a New England Journal of Medicine Study entitled "Adverse Events Associated with Testosterone Administration" was discontinued after an exceedingly high number of men in the testosterone group suffered adverse events.

82.     In November of 2013, a JAMA study was released entitled "Association of Testosterone Therapy with Mortality, Myocardial Infarction, and Stroke in Men with Low Testosterone Levels," in which a large cohort of men who used testosterone taken from a Veteran's Administration database was compared against a cohort of men who did not use

---

[18] Pugh PJ, Channer KS, Parry H, Downes T, Jone TH. Bio-available testosterone levels fall acutely following myocardial infarction in men: association with fibrinolytic factors. Endocr Res. 2002 Aug;28(3):161-73.

[19] Maria A. Cavasin , Zhen-Yin Tao , Ai-Li Yu , Xiao-Ping Yang; American Journal of Physiology - Heart and Circulatory PhysiologyPublished 1 May 2006**Vol.** 290**no.** H2043-H2050**DOI:** 10.1152/ajpheart.01121.2005

[20] Ajayi, A., et al., Testosterone Increases Human Platelet Thromboxane A2 Receptor Density and Aggregation Responses. Circulation. 1995; 91: 2742-2747.

testosterone. The data showed that among the cohort who used testosterone, the testosterone therapy raised the risk of death, heart attack, and stroke by about 30%.

83.     On January 29, 2014, a study was released in PLOS ONE entitled "Increased Risk of Non-Fatal Myocardial Infarction Following Testosterone Therapy Prescription in Men" that indicated testosterone use doubled the risk of heart attacks in men over sixty five years old and men younger than sixty five with a comorbid condition. The conclusion of this published study was that the risk of myocardial infarction following initiation of testosterone therapy prescription is substantially increased.

84.     In a study published in 2013,[21] based on a systematic review and meta-analysis of placebo-controlled randomized trials of testosterone therapy among men lasting 12+ weeks reporting cardiovascular-related events, two reviewers independently searched, selected, and assessed study quality with differences resolved by consensus. Additionally, two statisticians independently abstracted and analyzed data, and concluded that testosterone therapy increased the risk of a cardiovascular-related event. Their meta-analysis of the published literature also showed that the effect of testosterone therapy varied with source of funding. In trials not funded by the pharmaceutical industry, the risk of a cardiovascular-related event on testosterone therapy was greater than in pharmaceutical industry funded trials. The study concluded that the existing body of published medical literature demonstrates that in trials not funded by the pharmaceutical industry, exogenous testosterone increased the risk of cardiovascular-related events, with corresponding implications for the use of testosterone therapy.

85.     In some patient populations, testosterone use can increase the incidence of adverse events and death by over 500%.

---

[21] Xu, L., et al., Testosterone therapy and cardiovascular events among men: a systematic review and meta-analysis of placebo-controlled randomized trials. BMC Medicine 2013, 11:108.

### 5.     Inadequate Warnings and Labeling

86.     Defendants' marketing strategy has been to aggressively market and sell their products by misleading potential users and their physicians about the prevalence and symptoms of low testosterone and by failing to protect users from serious dangers that Defendants knew or should have known to result from use of its products.

87.     Defendants successfully marketed Depo-Testosterone by participating in and benefitting from "disease awareness" marketing campaigns. These campaigns sought to create a consumer perception that low testosterone is prevalent among U.S. men and that symptoms previously associated with other physical and mental conditions, such as aging, stress, depression, and lethargy were actually attributable to "Low-T."

88.     Defendants' sought to create the image and belief by consumers that the use of TRT was a safe method of alleviating their symptoms, had few side effects, and would not interfere with their daily lives, even though Defendants knew or should have known these to be false, and even though the Defendants had no reasonable grounds to believe them to be true.

89.     Defendants promoted and marketed TRT to physicians as a lifestyle drug that could treat "low testosterone" despite the fact the drug was never FDA approved for this.

90.     Defendants purposefully downplayed, understated, and outright ignored the health hazards and risks associated with using TRT. Defendants deceived potential users and their physicians by relaying positive information through the press and manipulating the definition of hypogonadism while downplaying known adverse and serious health effects.

91.     Defendants concealed material relevant information from potential users and their physicians, and minimized user and prescriber concern regarding the safety of Depo-Testosterone, including but not limited to its known propensity to drastically increase hematocrit and estradiol in users.

92.     In particular, in the warnings Defendants give in their commercials, online, and print advertisements, Defendants fail to mention any potential risk of cardiac event, stroke, pulmonary embolism or other dangerous side effects related to blood clotting and falsely represent they adequately tested Depo-Testosterone for all likely side effects. Defendants also fail to warn and instruct regarding the importance of adequate monitoring of hematocrit and estradiol levels.

93.     Depo-Testosterone's prescribing information and medication guide contained within the package materials do not warn against stroke, pulmonary embolism, transient ischemic attack, cardiovascular disease, myocardial infarction, coronary heart failure, or any thromboembolic event not related to polycythemia.

94.     The Depo-Testosterone medication guide instructs patients to tell their healthcare provider if the patient:

- is allergic to the drug,

- has other allergies,

- develops side effects

However, the prescribing information and medication guide contained within the package materials fail to instruct patients to tell their healthcare provider if they have an underlying inherited trait which increases their risk of blood clotting, particularly the Factor V Leiden mutation, the Prothrombin gene mutation, high Factor VIII, high homocysteine, or the lupus anticoagulant. They also inadequately instruct patients or physicians to be aware of the presence of comorbid conditions or pre-existing heart disease, which has been proven to double the risk in men under the age of 65 who use testosterone therapy.

95.     The prescribing information and medication guide do not instruct physicians or patients that it can increase a red blood cell count to the point that it more than doubles the risk for stroke, pulmonary embolism, ischemic heart disease, coronary heart failure, and myocardial infarction. The warning in regard to red blood cell count does not warn patients and their physicians that hematocrit levels can rise by as much as 10% above normal range, nor does it warn of the serious and life threatening risks that are associated with a red blood cell count that exceeds 50%, including the fact that individuals with a hematocrit greater than or equal to 51% have a doubling of the risk of stroke, new-onset heart failure, and coronary heart disease.

96.     The prescribing information and medication guide fail to warn patients and their physicians that the product can cause dangerous increases in hematocrit much more rapidly, and also fail to instruct physicians to monitor their patient's hematocrit more frequently.

97.     The prescribing information and medication guide fail to state that testosterone replacement therapy should not be administered to men who have an underlying inherited trait which increases their risk of blood clotting, particularly the Factor V Leiden mutation, the Prothrombin gene mutation, high Factor VIII, high homocysteine, or the lupus anticoagulant because the increase in serum estradiol caused by the drug can interact with the underlying clotting trait to produce blood clots in the legs, the lungs, the eyes, the brain, and the bones. They also fail to instruct physicians to screen all patients for underlying clotting traits before prescribing testosterone replacement therapy.

98.     The prescribing information and medication guide are inadequate regarding warning of the drug's potential to cause blood clots. There is no warning that blood clots in veins as a consequence of polycythemia could result in pulmonary embolism, or other injuries secondary to the formation of deep vein thrombosis in the legs or other parts of the body.

99.     The prescribing information and medication guide fail to warn that use of the product may result in elevated levels of estradiol. They do not instruct physicians to monitor estradiol levels, nor do they provide any guidance to physicians or patients regarding the significant health risks associated with elevated levels of serum estradiol in men, including the fact that there was a two-fold excess risk of stroke for men who had serum estradiol levels in the top quintile versus those men whose estradiol levels were lower, and that estradiol blood levels greater than 34.1 pg/mL resulted in more than doubling of stroke incidence in men. There is also no warning that elevated serum estradiol levels resulting from use of the product can cause impairment of contractility of the heart.

100.     The prescribing information and medication guide do not warn that use of the product may cause elevated levels of estradiol and those may lead to the formation of deep vein thrombosis, pulmonary embolism, stroke, infarction, coronary heart failure, cardiovascular disease, or myocardial infarction.

101.     The prescribing information and medication guide do not warn of the very serious health risks for men over the age of 65 who use testosterone replacement therapy. There is no mention of the fact that there is a doubling of the risk of heart attacks in men over the age of 65 who use testosterone replacement therapy, despite the fact that the data supporting this finding has been available for years. This absence of a warning fails to adequately advise and instruct patients and their physicians of the very serious health risks caused by the use of testosterone in this patient population.

102.     In November of 2013, Rebecca Vigen, Colin I. O'Donnell, Anna E. Barón, Gary K. Grunwald, et al. published an article in the Journal of the American Medical Association

entitled "Association of Testosterone Therapy with Mortality, Myocardial Infarction, and Stroke in Men with Low Testosterone Levels" ("Vigen Paper").

103.    The Vigen Paper concluded: "Use of testosterone therapy in this cohort of veterans with significant medical comorbidities was associated with increased risk of mortality, MI, or ischemic stroke." In fact, testosterone therapy increased the risk of death, heart attack, and stroke by approximately 30%.

104.    On January 29, 2014, William D. Finkle, Sander Greenland, Gregory K. Ridgeway John L. Adams, *et al.* published an article in PLOS ONE entitled: Increased Risk of Non-Fatal Myocardial Infarction Following Testosterone Therapy Prescription in Men ("Finkle Paper").

105.    The Finkle Paper demonstrated an increased risk of heart attack in men over age 65 years, and in men younger than 65 years with a prior history of heart disease.

106.    The increased incidence of heart attack and stroke was foreseeable much of or the entire time Defendants promoted and sold TRT.

107.    On June 19, 2014, and in response to post-market reports of venous blood clots unrelated to polycythemia in testosterone users, the FDA announced it was requiring manufacturers of testosterone to include a general warning in the drug labeling of all approved testosterone products about the risk of venous thromboembolism (VTE), including deep vein thrombosis (DVT) and pulmonary embolism (PE):

**FDA adding general warning to testosterone products about potential for venous blood clots**

[06/19/2014] The U.S. Food and Drug Administration (FDA) is requiring manufacturers to include a general warning in the drug labeling of all approved testosterone products about the risk of blood clots in the veins. Blood clots in the veins, also known as venous thromboembolism (VTE), include deep vein thrombosis (DVT) and pulmonary embolism (PE). The risk of venous blood clots is already included in the labeling of testosterone products as a possible consequence of polycythemia, an abnormal increase in the number of red blood cells that sometimes occurs with testosterone treatment. Because there have been postmarket reports of venous blood clots unrelated to polycythemia, FDA is requiring a change to drug labeling of all testosterone products to provide a more general warning regarding venous blood clots and to ensure this risk is described consistently in the labeling of all approved testosterone products.

Because these clots occur in the veins, this new warning is not related to FDA's ongoing evaluation of the possible risk of stroke, heart attack, and death in patients taking testosterone products. We are currently evaluating the potential risk of these cardiovascular events, which are related to blood clots in the arteries and are described in the Drug Safety Communication posted on January 31, 2014.

Testosterone products are FDA-approved for use in men who lack or have low testosterone levels in conjunction with an associated medical condition. Examples of these conditions include failure of the testicles to produce testosterone for reasons such as genetic problems or chemotherapy.

108.    The prescribing information and the medication guide still lack a sufficient warning about the risks of elevated estradiol levels and the need to screen for underlying clotting traits, and they contain no warning for strokes or for cardiovascular injuries.

109.    The marketing and promotion of the product to patients and physicians overstated its benefits by creating the impression that it was a safe and effective treatment for "low testosterone," for which it was not FDA approved. This is misleading and fails to adequately warn physicians and patients about the numerous, life-threatening health risks associated with use of the drug.

110.    Because of Defendants' advertising, marketing, and representations about its product, men in the United States pervasively seek out prescriptions for TRT. If Plaintiff and his

physician had known the risks and dangers associated with TRT, the physician would not have prescribed nor would Plaintiff would have taken TRT and consequently would not have been subject to its serious side effects; and/or, Plaintiffs' physicians would have adequately monitored Plaintiffs' hematocrit and estradiol levels, and, as a result, Plaintiffs' injuries would have not otherwise have occurred.

### 6.    Case Specific Facts

111.    Mr. Kingery served in the Army for two years, then worked at General Electric for more than 30 years. As a rather young retiree, he devoted his time to his wife, his four children, his 20 grandchildren, his two great-grandchildren, his house, and fishing.

112.    In July of 2013, Mr. Kingery, 63, presented with some fatigue, a decrease in libido, and some instances of erectile dysfunction.

113.    As Defendants' marketing suggested, Mr. Kingery's doctor suggested "low testosterone" could explain his symptoms and ordered a testosterone serum test. Mr. Kingery's resulting "139" met Defendants' definition of "low testosterone." Also as Defendants' marketing suggested, Mr. Kingery's doctor prescribed 200mg/ml Depo-Testosterone shots every 14 days to help fatigue and low libido.

114.    Mr. Kingery had Depo-Testosterone shots on July 23, August 6, August 20, and September 3, 2013.

115.    On September 8, 2013, five days after his fourth and final Depo-Testosterone shot, Mr. Kingery went about working in the yard. Around midday, Mr. and Mrs. Kingery took a ride together around their property on their Gator vehicle. When they arrived back at the house, however, Mr. Kingery said he needed help getting up. Because he was normally very agile, Mrs. Kingery thought he was joking in asking for help. The only other thing he was able to do before slumping over was to tell Mrs. Kingery he loved her. The responding paramedics and their EMT

neighbor were unable to revive Mr. Kingery and he was pronounced dead due to a massive heart attack.

116.    Defendants' aggressive marketing and off-label detailing led to Mr. Kingery taking Depo-Testosterone and the dangerous drug led to his heart condition and death.

117.    Defendants materially and deceptively misrepresented and mischaracterized the definition of hypogonadism to Plaintiff and his physician.

118.    There was no warning to Plaintiff or his physician that the product presented significant risks to men who took it, including Plaintiff's death.

119.    Had Plaintiff and his physicians known the true risks associated with the use of testosterone medications, including Depo-Testosterone, he would not have consumed the Depo-Testosterone, and/or would have been adequately monitored for its side effects, and as a result, would not have incurred the injuries or damages he did as a result of his use of Depo-Testosterone.

## II.      CAUSES OF ACTION

### COUNT I
### STRICT PRODUCTS LIABILITY – FAILURE TO WARN

120.    Plaintiff adopts by reference each and every paragraph of the Complaint applicable to all counts of this Complaint, and each and every count of this Complaint as if fully copied and set forth at length herein.

121.    Defendants are liable under the theory of product liability as set forth in §§ 402A and 402B of the Restatement of Torts 2d.

122.    The Depo-Testosterone manufactured and/or supplied by Defendants was defective due to inadequate warnings or instructions because Defendants knew or should have

known that the product created significant risks of serious bodily harm to consumers, and they failed to adequately warn consumers and/or their health care providers of such risks.

123.    Defendants failed to adequately warn consumers and/or their health care providers that Depo-Testosterone could cause heart attacks, strokes, pulmonary embolism, cardiovascular events and blood clots.

124.    Defendants failed to adequately warn consumers and/or their health care providers that while a patient was taking Depo-Testosterone it was necessary to frequently monitor hematocrit and estradiol levels to prevent heart attacks, strokes, pulmonary embolisms, cardiovascular events, and blood clots.

125.    The Depo-Testosterone manufactured and/or supplied by Defendants was defective due to inadequate post-marketing warnings or instructions because, after Defendants knew or should have known of the risk of serious bodily harm from the use of Depo-Testosterone, Defendants failed to provide an adequate warning to consumers and/or their health care providers of the product, knowing the product could cause serious injury.

126.    As a direct and proximate result of Plaintiff's reasonably anticipated use of Depo-Testosterone as manufactured, designed, sold, supplied, marketed, and/or introduced into the stream of commerce by Defendants, Plaintiff suffered serious injury, harm, damages, economic and non-economic loss and will continue to suffer such harm, damages and losses in the future.

## COUNT II
## NEGLIGENCE

127.    Plaintiff adopts by reference each and every paragraph of the Complaint applicable to all counts of this Complaint, and each and every count of this Complaint as if fully copied and set forth at length herein.

128.  At all times herein mentioned, Defendants had a duty to properly manufacture, design, formulate, compound, test, produce, process, assemble, inspect, research, distribute, market, label, package, distribute, prepare for use, sell, prescribe, and adequately warn of the risks and dangers of Depo-Testosterone.

129.  At all times material hereto, Defendants had actual knowledge, or in the alternative, should have known through the exercise of reasonable and prudent care, of the hazards and dangers of Depo-Testosterone to cause, or increase the harm of among other severe injuries, myocardial infarction, cerebrovascular accident, deep vein thrombosis and it sequelae, pulmonary embolism, and sudden cardiovascular death.

130.  Defendants had a duty of care when they undertook to provide comprehensive medical information to consumers and patients concerning "low testosterone" as a medical diagnostic entity, to educate and inform consumers and patients about "low testosterone," and, to provide consumers and patients with the means for self-diagnostic screening and in-home testing for "low testoerone."

131.  Defendants had a duty to disclose to physicians and healthcare providers the causal relationship or association of Depo-Testosterone to heart attack, stroke, deep vein thrombosis and its sequelae, pulmonary embolism, and sudden cardiac death.

132.  Defendant's duty of care owed to consumers and patients included providing accurate, true, and correct information concerning:

- hypogonadism and its diagnostic criteria;

- the FDA-approved indications for the clinical use of the Depo-Testosterone product;

- the clinical safety and effectiveness profiles of Depo-Testosterone; and,

- appropriate, complete, and accurate warnings concerning the adverse effects of Depo-Testosterone, including heart attack, stroke, pulmonary embolism, deep vein thrombosis and its sequelae, and sudden cardiac death.

133.    At all times herein mentioned, Defendants breached their duty of care by negligently and carelessly manufacturing, designing, formulating, distributing, compounding, producing, processing, assembling, inspecting, distributing, marketing, labeling, packaging, preparing for use and selling Depo-Testosterone and by failing to adequately test and warn of the risks and dangers of Depo-Testosterone as described herein.

134.    Defendants negligently and carelessly disregarded the applicable regulations and industry standards regarding the prohibition against off-label marketing, misbranding, and label expansion, and, as a result, millions of men, including Plaintiff, were prescribed Depo-Testosterone unnecessarily, and therefore needlessly exposed to serious health risks for which there were no or inadequate warnings.

135.    At all times material hereto, Defendants sought to mislead and misinform physicians concerning the FDA-approved uses for Depo-Testosterone, including Plaintiff's prescribing physician. Specifically, the FDA had not approved Depo-Testosterone or any other testosterone-containing preparation for the treatment of "low testosterone."

136.    At all times material hereto, Defendants recklessly, intentionally, and knowingly detailed and promoted the testosterone-containing product Depo-Testosterone with the intent that men be prescribed testosterone therapy by physicians for "off-label" clinical indications.

137.    Despite the fact that Defendants knew or should have known that Depo-Testosterone caused unreasonable, dangerous side effects, Defendants continued to market Depo-Testosterone to consumers including Plaintiff, when there were safer alternative methods

and/or no need to treat conditions such as loss of energy, libido erectile dysfunction, depression, loss of muscle mass, and other conditions that Defendants and their competitors claim are caused by "low testosterone."

138.    At all times material hereto, Defendants misbranded the Depo-Testosterone product on an ongoing and continuous basis, and failed to warn physicians and patients that Depo-Testosterone was not approved for the treatment of "low testosterone," for the treatment of age-related declines in testosterone, or for the treatment of age-related symptoms in men.

139.    Defendants failed to disclose to physicians, consumers, and patients the known cardiovascular and cerebrovascular risks causally associated with Depo-Testosterone use.

140.    As marketed, detailed, and promoted to physicians—including Plaintiff's prescribing physician—Defendants failed to warn that Depo-Testosterone caused, or increased the risk of harm of, cardiovascular and cerebrovascular injuries, including myocardial infarction and cerebrovascular accident, pulmonary embolism, deep vein thrombosis and its sequelae, and sudden cardiac death.

141.    Defendants knew or should have known that consumers such as Plaintiff would foreseeably suffer injury because of Defendants' failure to exercise ordinary care as described above.

142.    Defendants' negligence was a proximate cause of the Plaintiff's injuries, harm, and economic loss which Plaintiff suffered, and will continue to suffer, as described and prayed for herein.

## COUNT III
## BREACH OF IMPLIED WARRANTY

143.     Plaintiff adopts by reference each and every paragraph of the Complaint applicable to all counts of this Complaint, and each and every count of this Complaint as if fully copied and set forth at length herein.

144.     Prior to the time that the aforementioned products were used by the Plaintiff, Defendants impliedly warranted to Plaintiff and Plaintiff's agents and physicians that Depo-Testosterone was of merchantable quality and safe and fit for the use for which it was intended.

145.     Specifically, Defendants warranted to Plaintiff that its product was intended to treat low testosterone and that it was safe and fit for that use, but the Defendants failed to disclose that "low testosterone" is not a recognized medical condition and that its testosterone product was not FDA approved to treat any such condition.

146.     Plaintiff was and is unskilled in the research, design, and manufacture of medical drugs, including Depo-Testosterone, and reasonably relied entirely on Defendants' skill, judgment, and implied warranty in using Depo-Testosterone. As a result, Plaintiff trusted Defendants' warranty and used Defendants' product as Defendants intended.

147.     Depo-Testosterone was neither safe for its intended use nor of merchantable quality, as warranted by Defendants, in that Depo-Testosterone has dangerous propensities when used as intended and will cause severe injuries to users.

148.     Because of the abovementioned breach of implied warranties by Defendants, Plaintiff suffered injuries and damages as alleged herein.

## COUNT IV
## BREACH OF EXPRESS WARRANTY

149.    Plaintiff adopts by reference each and every paragraph of the Complaint applicable to all counts of this Complaint, and each and every count of this Complaint as if fully copied and set forth at length herein.

150.    At all times mentioned, Defendants expressly represented and warranted to Plaintiff and Plaintiff's agents and physicians, by and through statements made by Defendants or their authorized agents or sales representatives, orally and in publications, package inserts, and other written materials intended for physicians, medical patients, and the general public, that Depo-Testosterone was FDA approved to treat a condition called "low testosterone", and that it is safe, effective, fit, and proper for its intended use. Plaintiff purchased Depo-Testosterone relying on these warranties and continued to purchase Depo-Testosterone relying on these warranties.

151.    In utilizing Depo-Testosterone, Plaintiff relied on the skill, judgment, representations, and foregoing express warranties of Defendants. These warranties and representations were false in that there is no disease or medical condition called "low testosterone" that is recognized by any medical community, peer-reviewed journal, or learned treatise, and that Depo-Testosterone is unsafe and unfit for its purported intended uses.

152.    As a result of the abovementioned breach of express warranties by Defendants, Plaintiff suffered injuries and damages as alleged herein.

## COUNT V
## FRAUD

153.    Plaintiff adopts by reference each and every paragraph of the Complaint applicable to all counts of this Complaint, and each and every count of this Complaint as if fully copied and set forth at length herein.

154. Through their own and by taking advantage of their competitors' sophisticated and well-orchestrated marketing campaigns, Defendants set out to invent a fictitious disease/medical condition called "low testosterone" or "Low T" and then purposely deceived the Plaintiff and his physicians into believing that this was a real disease/medical condition and that Depo-Testosterone was a safe remedy for this disease.

155. Defendants, from the time they first tested, studied, researched, evaluated, endorsed, manufactured, marketed, and distributed Depo-Testosterone, and up to the present, knew that their product could cause an increase in hematocrit in patients to a level that more than doubles their risk for stroke, heart attack, and clot formation that could result in pulmonary embolism, and as result of published, peer-reviewed medical literature knew that the use of its product could result in a dramatic increase in serum estradiol levels, yet Defendants willfully deceived Plaintiff by concealing from him, from Plaintiff's physicians, and from the general public, the true facts concerning Depo-Testosterone, which the Defendants had a duty to disclose.

156. At all times herein mentioned, Defendants conducted a sales and marketing campaign to promote the sale of Depo-Testosterone and willfully deceive Plaintiff, Plaintiff's physicians, and the general public as to the benefits, health risks, and consequences of using Depo-Testosterone. Defendants knew of the foregoing, that Depo-Testosterone is not safe, fit, and effective for human consumption, that using Depo-Testosterone is hazardous to health, and that Depo-Testosterone has a strong propensity to cause serious injuries to its users, including but not limited to the injuries Plaintiff suffered.

157. Defendants knowingly, falsely, deceptively, and inaccurately designated the physiologic decrease in men's testosterone levels and the age-related symptoms men experience

with aging as a form of acquired hypogonadism with the intent to deceive physicians into prescribing Depo-Testosterone for "off-label" indications for clinical use, to engage in "label expansion" of the Depo-Testosterone product, and to drive increasing consumer and patient demand for Depo-Testosterone prescriptions.

158.     Defendants knowingly, falsely, deceptively, and inaccurately misstated the clinical effectiveness profile of Depo-Testosterone to physicians, including by making statements concerning the effectiveness of Depo-Testosterone to treat "low testosterone" and age-related symptoms. Defendants conducted no double blind, placebo-controlled, randomized, sufficiently powered, and independent study or clinical investigation to support this use of Depo-Testosterone, and gained no FDA approval that warranted promotion of Depo-Testosterone for these indications.

159.     Defendants knowingly, falsely, deceptively, and inaccurately designated and represented that the physiologic decline in men's testosterone levels and the age-related symptoms men experience with advancing age, as a form of "acquired hypogonadism" with the intent to confuse and deceive consumers and patients, and to foster the belief by consumers and patients, including Plaintiff, that they harbored a "disease" or pathologic medical condition that was appropriately treated with the Depo-Testosterone product.

160.     Defendants concealed and suppressed the true facts concerning Depo-Testosterone, and the actual disease for which it has been FDA approved to treat (Hypogonadism), with the intent to defraud Plaintiff, in that Defendants knew Plaintiff's physicians would not prescribe Depo-Testosterone, and Plaintiff would not have used Depo-Testosterone, if they were aware of the true facts concerning its dangers.

161.    Defendants knew, understood, and intended that consumers would rely upon the comprehensive medical information that it provided to consumers and patients through its multi-platform marketing, promotional, educational, and awareness campaigns concerning the Depo-Testosterone product and its indications for clinical use and further knew that consumers and patients would make treatment choices and exercise treatment options about their use of the Depo-Testosterone product in reliance upon this information.

162.    Defendants deceived physicians by explicitly or implicitly claiming that the treatment of "low testosterone" was an FDA-approved clinical indication for use of Depo-Testosterone, when in fact it was an "off-label" indication for clinical use.

163.    Consumers, including Plaintiff, required, and should have been provided with, truthful, accurate, and correct information concerning the FDA-approved indications for the clinical use for Depo-Testosterone and the clinical safety and effectiveness profiles for Depo-Testosterone, including information concerning the "off-label" use of the Depo-Testosterone product.

164.    Plaintiff and/or his physicians relied on the fraudulent and deceptive representations made by the Defendants to his detriment. Specifically, Plaintiff and/or his physicians relied on representations that "low testosterone" was an actual disease that required medical treatment and use of prescription testosterone, that Depo-Testosterone was FDA approved to treat a condition called "low testosterone", and that the Defendants' testosterone drug was a safe and effective treatment for his "low testosterone."

165.    Plaintiff would not have sought or continued treatment for "low testosterone" or administered Depo-Testosterone had Defendants provided him with adequate, true, accurate, and correct information about the risks of cardiovascular events and cerebrovascular accident

causally associated with the use of Depo-Testosterone, and the fact that "low testosterone" was not an FDA-approved indication for clinical use of Depo-Testosterone.

166.    Plaintiff would not have sought or continued treatment for "low testosterone" or administered Depo-Testosterone had Defendants provided him with adequate, true, accurate, and correct information about the lack of proven clinical profiles of safety or effectiveness for the use of Depo-Testosterone to treat "low testosterone."

167.    During the detailing, marketing, and promotion to physicians, neither Defendants nor the co-promoters who were detailing Depo-Testosterone on behalf of Defendants warned physicians, including Plaintiff's prescribing physician, that Depo-Testosterone caused or increased the risk of harm of cerebrovascular accident and neurologic injuries.

168.    Defendants' detailing materials did reach Plaintiff and/or his physicians, and he relied upon these materials in reaching his decision to purchase, use, and continue the use of Depo-Testosterone throughout his course of testosterone therapy.

169.    Plaintiff would not have taken Depo-Testosterone initially and would not have continued to take Depo-Testosterone had the educational and informational materials made available to him by Defendants, and upon which he relied to his detriment, informed him about the risks of cardiovascular events and cerebrovascular accident with product use.

170.    Because of Defendants' fraudulent and deceitful conduct, Plaintiff suffered injuries and damages as alleged herein.

**COUNT VI**
**NEGLIGENT MISREPRESENTATION**

171.    Plaintiff adopts by reference each and every paragraph of the Complaint applicable to all counts of this Complaint, and each and every count of this Complaint as if fully copied and set forth at length herein.

172.     From the time Depo-Testosterone was first tested, studied, researched, evaluated, endorsed, manufactured, marketed, and distributed, and up to the present, Defendants made misrepresentations to Plaintiff, Plaintiff's physicians, and the general public, including but not limited to the misrepresentation that "low testosterone" was an actual disease/medical condition for which medical treatment was indicated, and that Depo-Testosterone was safe, fit, effective, and FDA-approved for human consumption to treat "low testosterone." At all times mentioned, Defendants conducted a sales and marketing campaign to promote the sale of Depo-Testosterone and willfully deceive Plaintiff, Plaintiff's physicians, and the general public as to the health risks and consequences of the use of the Depo-Testosterone.

173.     Defendants made the foregoing representations without any reasonable ground for believing them to be true. These representations were made directly by Defendants, by sales representatives and other authorized agents of Defendants, and in publications and other written materials directed to physicians, medical patients, and the public, with the intention of inducing reliance and the prescription, purchase, and use of the subject product.

174.     The representations by the Defendants were in fact false in that Depo-Testosterone is not safe, fit, and effective for human consumption, using Depo-Testosterone is hazardous to health, and Depo-Testosterone has a strong propensity to cause serious injuries to users, including but not limited to the injuries suffered by Plaintiff.

175.     The foregoing representations by Defendants, and each of them, were made with the intention of inducing reliance and the prescription, purchase, and use of Depo-Testosterone.

176.     Plaintiff relied on the misrepresentations made by the Defendant to his detriment. Specifically, Plaintiff relied on representations that "low testosorone" was an actual disease that required medical treatment and use of prescription testosterone, that Depo-Testosterone was

FDA-approved to treat a condition called "low testosterone ," and that the Defendants' testosterone drug was a safe and effective treatment for his "low testosterone."

177.    In reliance of Defendants' misrepresentations, Plaintiff was induced to purchase and use Depo-Testosterone. If Plaintiff had known of the true facts and the facts concealed by the Defendants, he would not have used Depo-Testosterone. Plaintiff's reliance on Defendants' misrepresentations was justified because such misrepresentations were made and conducted by individuals and entities that were in a position to know the true facts.

178.    As a result of the foregoing negligent misrepresentations by Defendants, Plaintiff suffered injuries and damages as alleged herein.

## COUNT VII
## DESIGN DEFECT

179.    Plaintiff adopts by reference each and every paragraph of the Complaint applicable to all counts of this Complaint, and each and every count of this Complaint as if fully copied and set forth at length herein.

180.    Defendants participated in the manufacture, sale, and marketing of an exogenous testosterone drug that was FDA approved to treat a specific medical condition called Hypogonadism, which is defined as a condition in which a male produces no or very low testosterone in conjunction with an associated medical condition, such as failure of the testicles to produce testosterone for reasons such as genetic problems or chemotherapy.

181.    Defendants manufactured, sold, and promoted the drug to treat a nonexistent medical condition they called "low testosterone," which they used to describe the constellation of symptoms experienced by men as a result of the normal aging process. In essence, Defendants marketed and sold testosterone as a lifestyle drug meant to make men feel younger and increase libido.

182.    The drug Defendants manufactured, sold, and promoted was unsafe and contained a defective condition in that in that it caused serious injuries and death as the result of the formation of blood clots and adverse cardiovascular events, including but not limited to deep vein thrombosis, pulmonary embolism, stroke, ischemic injuries, infarctions, coronary heart failure, and cardiovascular disease.

183.    This design defect made the drug unreasonably dangerous, yet Defendants knowingly introduced the drug into the market.

184.    The drug as manufactured by Defendants remained unchanged and was in the same condition at the time of the injury hereafter alleged.

185.    As a direct and proximate cause of Defendants' manufacture, sale, and promotion of the defectively designed drug, Plaintiff sustained permanent injury.

## COUNT VIII
## LOSS OF CONSORTIUM, WRONGFUL DEATH, AND/OR SURVIVOR ACTION

186.    Plaintiff adopts by reference each and every paragraph of the Complaint applicable to all counts of this Complaint, and each and every count of this Complaint as if fully copied and set forth at length herein.

187.    Defendants' wrongful actions caused Plaintiff's death.

188.    Plaintiff's death has deprived his spouse and family of services, companionship, and society for the remainder of their lives.

189.    Defendants' wrongful actions directly and proximately caused the loss of services, companionship, and society.

190.    Under various state laws, Defendants are liable for the loss of consortium, wrongful death, and/or survivor claims because of their action that caused Plaintiff's death.

## PUNITIVE DAMAGES ALLEGATIONS

191.   Plaintiff adopts by reference each and every paragraph of the Complaint applicable to all counts of this Complaint, and each and every count of this Complaint as if fully copied and set forth at length herein.

192.   The acts, conduct, and omissions of Defendants, as alleged throughout this Complaint were willful and malicious. Defendants committed these acts with a conscious disregard for the rights, health, and safety of Plaintiff and other Depo-Testosterone users and for the primary purpose of increasing Defendants' profits from the sale and distribution of Depo-Testosterone. Defendants' outrageous and unconscionable conduct warrants an award of exemplary and punitive damages against Defendants in an amount appropriate to punish and make an example of Defendants.

193.   Prior to the manufacturing, sale, and distribution of Depo-Testosterone, Defendants knew that said medication was in a defective condition as previously described herein and knew that those who were prescribed the medication would experience and did experience severe physical, mental, and emotional injuries. Further, Defendants, through their officers, directors, managers, and agents, knew that the medication presented a substantial and unreasonable risk of harm to the public, including Plaintiff, and, as such, Defendants unreasonably subjected consumers of said drugs to risk of injury or death from using Depo-Testosterone.

194.   Despite their knowledge, Defendants, acting through their officers, directors, and managing agents for the purpose of enhancing Defendants' profits, knowingly and deliberately failed to remedy the known defects in Depo-Testosterone and failed to warn the public, including Plaintiff, of the extreme risk of injury occasioned by said defects inherent in Depo-Testosterone. Defendants and their agents, officers, and directors intentionally proceeded with the

41

manufacturing, sale, distribution, and marketing of Depo-Testosterone knowing these actions would expose persons to serious danger in order to advance Defendants' pecuniary interest and monetary profits.

195. Defendants' conduct was despicable and so contemptible that it would be looked down upon and despised by ordinary decent people, and was carried on by Defendants with willful and conscious disregard for the safety of Plaintiff, entitling Plaintiff to exemplary damages.

## **PRAYER**

**WHEREFORE,** Plaintiffs pray for judgment against Defendants, as follows, as appropriate to each cause of action alleged and as appropriate to the particular standing of Plaintiffs:

A.     General damages in an amount that will conform to proof at time of trial;

B.     Special damages in an amount within the jurisdiction of this Court and according to proof at the time of trial;

C.     Loss of earnings and impaired earning capacity according to proof at the time of trial;

D.     Medical expenses, past and future, according to proof at the time of trial;

E.     For past and future mental and emotional distress, according to proof;

F.     Damages for loss of care, comfort, society, and companionship in an amount within the jurisdiction of this Court and according to proof;

G.     For punitive or exemplary damages according to proof;

H.     Restitution, disgorgement of profits, and other equitable relief;

I.     Injunctive relief;

J.     Attorneys' fees;

K.      For costs of suit incurred herein;

L.      For pre-judgment interest as provided by law; and

M.     For such other and further relief as the Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a jury trial on all claims so triable in this action.

September 3, 2014

Respectfully Submitted,

*/s/ Michelle L. Kranz*
Michelle L. Kranz (0062479)
James G. O'Brien (0088460)
ZOLL, KRANZ & BORGESS, LLC
6620 W. Central Ave., Suite 100
Toledo, OH 43617
Tel.    (419) 841-9623
Fax.   (419) 841-9719
Email: jim@toledolaw.com
Email: michelle@toledolaw.com

*Counsel for Plaintiffs*